AO 91 (Rev. 11/11) Criminal Complaint

# FILED

# UNITED STATES DISTRICT COURT
### for the

Eastern District of California

MAY 05 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| James Christopher Malcolm ) | |
| ) | **2:14 - MJ - 102**     CKD |
| ) | |
| _____ ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 4, 2014 - 5/4/2014___ in the county of ___Sacramento___ in the

___Eastern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | -Unlawful Dealing in Firearms |
| 18 U.S.C. § 922(o) | -Unlawful Possession and Transfer of a Machinegun |
| 18 U.S.C. § 844(o) | -Transfer of Explosive Materials for Use in a Crime of Violence or Drug Trafficking Crime |
| 26 U.S.C. § 5861(f) | -Unlawful Manufacturing of a Firearm |

This criminal complaint is based on these facts:

See Attached Affidavit of Special Agent Daniel H. Yun

☑ Continued on the attached sheet.

_____
*Complainant's signature*

ATF Special Agent Daniel H. Yun
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___5/4/2014___

_____
*Judge's signature*

City and state: ___El Dorado Hills, California___

Magistrate Judge Carolyn K. Delaney
*Printed name and title*

## AFFIDAVIT AND APPLICATION IN SUPPORT OF SEARCH WARRANT

I, Daniel H. Yun, being duly sworn, hereby depose and state:

## INTRODUCTION

1.      I make this Affidavit in support of an application for the following:

   a. A search warrant for 3226 Garfield Avenue, Carmichael, CA, the residence of James Christopher Malcolm, as further described in Attachment A-1.

   b. A search warrant for Longview Self-Storage, 4203 Industry Drive, Unit J5, Sacramento, CA, a storage unit believed to be used by James Christopher Malcolm, as further described in Attachment A-2.

   c. A search warrant for blue 2007 Chevrolet Trailblazer, California license 6ZCV910 (the **"Target Vehicle"**), believed to be used by James Christopher Malcolm, as further described in Attachment A-3.

   d. A criminal complaint and arrest warrant for James Christopher Malcolm.

## AGENT BACKGROUND

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been an ATF Special Agent since September 2012. Prior to working for ATF, I was employed as a Captain in the United States Army for approximately nine years. I have received training in Federal firearms and explosives laws and regulations at the ATF National Academy and Federal Law Enforcement Criminal Investigator Training Program. I have investigated numerous cases involving federal firearms violations, involving unlawful sales, possession, manufacturing, and transportation of firearms and explosives. I have participated in a variety of different aspects of those investigations, including surveillance, undercover operations to conduct controlled purchases of firearms and/or controlled substances, and the execution of search and arrest warrants.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## APPLICATION

5.      Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that James Christopher Malcolm has committed the following violations (the "Target Offenses"):

   a.  18 U.S.C. § 922(a)(1)(A) – Unlawful Dealing in Firearms

   b.  18 U.S.C. § 922(o) – Unlawful Possession and Transfer of a Machinegun

   c.  18 U.S.C. § 844(o) – Transfer of Explosive Materials for Use in a Crime of Violence or Drug Trafficking Crime

   d.  26 U.S.C. § 5861(f) – Unlawful Manufacturing of a Firearm

6.      This Affidavit is submitted in connection with an ATF and FBI investigation into firearms and explosive trafficking. Based on information obtained from law enforcement operations to include undercover purchases and surveillance, I believe that the locations identified in Attachment A-1, A-2, and A-3 contain evidence, fruits, and instrumentalities of the Target Offenses.

## BACKGROUND OF THE INVESTIGATION

7.      On February 26, 2014, law enforcement personnel met with a confidential informant (hereinto referred to as CI). The CI informed law enforcement that the CI had met with an individual that the CI knew as "James," and that "James" told the CI that he could manufacture parts to convert Glock handguns and AR-15 style rifles into full automatic firearms. The CI stated that James's phone number was (916) 607-5960 ("TT#1"). The CI was advised to attempt to contact the individual know as "James" by telephone and converse with James regarding manufacturing full auto firearms.

   a.  The CI currently has a pending criminal case for which the CI has asked for consideration in exchange for assisting law enforcement.

8.  The CI sent "James" a text to TT#1 asking if "James" could talk. "James" immediately called the CI from TT#1. Law enforcement recorded the conversation. The CI and "James" discussed "James" selling fully automatic Glock handguns to the CI.

9.  A records check of the telephone number for TT#1 determined that the subscriber of TT#1 was an individual named James Malcolm. The CI was shown a picture of James Malcolm. The CI confirmed that James Malcolm was the individual that the CI knew as "James."

## February 27, 2014 Meeting with Malcolm

10. On February 27, 2014, the CI placed a phone call to James Malcolm at TT#1. The CI and James Malcolm had the following conversation in summary:

    a.  The CI informed Malcolm that the CI would not be able to obtain any AR-15 rifles for a few days because the supplier was out of town. Malcolm was concerned that the supplier would not fulfil the order in the future. Malcolm stated that he was working a deal "with 'D' to distribute these out there and I already have like six or seven customers interested. I've been pushing it since we first talked and I know of at least like six or seven people right off the bat that want to buy." The CI advised Malcolm that the CI's buyer had obtained Glocks and that the buyer wanted to purchase "drop ins" for the Glocks.

        i.  Based on my training and experience, I believe "drops ins" refers to drop in auto sears. A drop auto sear is a firearm part that allows the firearm to fire fully automatic.

    b.  Malcolm stated, "Ok, I can do that." Malcolm told the CI that he already had the "drop ins pretty much in stock." Malcolm stated that the "reason I'm hot on the AR's is because I ordered all the cam parts and the auto sear assemblies." Malcolm then stated that, "If we have a legitimate SBR (short barreled rifle) that is a select fire, dude there is a huge potential market for it." Malcolm asked the CI what the price would likely be for the AR-15s that the CI would be able to obtain so that Malcolm would know what to add for profit. Malcolm stated that he needed to know the price, "because then I got to turn around and retrofit them and sell them off to 'D.'" Malcolm stated that it would cost him $600 to convert the AR-15s to full auto because of the machining and the cost of the parts.

    c.  The CI advised Malcolm that the people the CI sold full auto AR-15s to in the past paid between $4,000-$5,000, and that the CI could sell Malcolm the AR-15s

between $1,000-$1,200. Malcolm told the CI that he thought the peak market price would be between $2,600-$2,900. Malcolm told the CI that he was "getting into an area that is extremely tough and you have to be 100% confident in these people. We have a medium that keeps everything anonymous and I like anonymous. I don't like dealing with people because people are the easiest way to get fucked in the ass." Malcolm advised the CI that they needed to make sure that the CI's supplier was able to produce because Malcolm had people that might be willing to purchase "big fucking orders, you know some really shady people and I don't want to sell them an order then be fucking stuck waiting for fucking units here." The CI advised Malcolm to just wait until the CI's supplier was back in town. Malcom stated that he just wanted to make sure that the "pipeline was secure" before he "got shit moving." Malcolm stated that he "didn't want to be offering shit to people that are kind of fucking scary if I can't fill it."

### March 1, 2014 Meeting

11.   On March 1, 2014, the CI met in person with James Malcolm. Law enforcement was able to remotely monitor a portion of the conversation between the CI and Malcom. The CI could be heard entering Malcolm's vehicle and speaking to Malcolm. Malcolm then told the CI to remove the battery from the CI's phone, at which point the remote monitoring of the conversation was no longer available. Law enforcement observed the CI and Malcolm meeting in a blue 2007 Chevrolet Trailblazer, California license 6ZCV910 (the "**Target Vehicle**").

   a.   A records check of the **Target Vehicle** showed that the registered owner was Tara Malcolm and James Malcolm at 3226 Garfield Ave, Carmichael, CA 95608.

12.   After the meeting, the CI informed law enforcement that the CI and Malcolm had spoken about Malcolm meeting the CI's source for AR-15 rifles and that Malcolm had agreed to meet with the source. Malcolm also told the CI that he was willing to show the source his machine shop. Malcolm told the CI that distributing firearms was only a side business, and that Malcolm's main business was distributing explosives and poison. Malcolm told the CI that he was able to obtain and sell an explosive called RDX.

   a.   RDX is a plastic explosive material commonly used in military and industrial applications.

## March 4, 2014 – CI Introduces Undercover Agents

13. On March 4, 2014, the CI introduced two undercover ATF Agents (hereinto referred to a UC) to James Malcolm. During the meeting the UCs discussed purchasing full auto Glock sears from Malcolm. Malcolm took the CI to his car during the meeting and threatened the CI's family if the UCs were not who they claimed to be. James Malcolm left the meeting in the **Target Vehicle**.

14. During the meeting with the UCs, Malcolm displayed a Glock auto sear to the UCs.

## March 10, 2014 – CI and UC Meet with Malcolm

15. On March 10, 2014, the CI and both UCs again met with James Malcolm. During the meeting Malcolm showed the UCs a video of a full auto Glock that Malcolm claimed to have manufactured. When questioned about the conversion of the Glock from semi auto to full auto Malcolm removed a Glock handgun from a holster and showed the UCs the part that had to be replaced to make the Glock full auto. Malcolm provided the UCs with the phone number of TT#1 to contact Malcolm directly in the future.

## March 18, 2014 – Malcolm Demonstrates Full Auto Firearms

16. On March 18, 2014, the UCs met James Malcolm in Placerville, CA. After meeting Malcolm in a parking lot the UCs followed Malcolm to a remote location in the El Dorado National Forest. Malcolm was driving the **Target Vehicle**. Once at the remote location Malcolm produced a Glock handgun, manipulated it to accept a full auto sear, then allowed the UCs to fire the handgun. The Glock handgun fired as a full-auto firearm (fired multiple rounds with one pull of the trigger). Malcolm then switched his Glock handgun to accept a full auto sear with a selector switch, and again allowed the UCs to fire the handgun. The UCs test fired the Glock handgun and found that it operated in both semi-auto and full-auto. The UCs provided Malcolm with a Glock handgun that the UCs brought to the meeting and asked if Malcolm was able to modify and install a full-auto sear. The sear that Malcolm installed allowed the user to fire the Glock handgun full-auto all the time. The UCs purchased two full-auto sears and two semi-auto/full-auto sears that when installed in Glock handguns allowed the firearm to fire full-auto. The full-auto only sears cost $200 each and the semi-auto/full-auto sears with selector switch cost $450 each.

### April 3, 2014 – Malcolm Sells Six Glock Auto Sears to the Undercover Agents

17. On April 3, 2014, the UCs met with Malcolm in San Francisco County. During the meeting with Malcolm, the UCs purchased six semi-auto/full-auto sears with selector switch to convert Glock firearms into full-auto firearms.

### April 16, 2014 – Malcolm Sells Four Short Barrel AR-15 Rifles and Explosives

18. On April 16, 2014, the UCs met with Malcolm and purchased the following items from Malcolm in exchange for $12,000 in U.S. currency:

   a. Four full-auto short barrel AR-15 rifles (Note: Malcolm is depicted below handing one of the AR-15 rifles. The photograph is from an undercover surveillance video.)
   b. One and one half pounds of explosive material (a improvised C-4-like explosive material) (Note: C-4-like material is depicted below.)
   c. Three improvised blasting caps (detonation devices)
   d. One suppressor for a Glock pistol
   e. One hundred and forty rounds of 5.56 ammunition





19.   During the meeting, Malcolm showed the UCs a video on his cell phone. Malcolm claimed that the video was a demonstration that he conducted of the same C-4-like material. The video depicted a fuse slowly burning and then a large explosion.

20.   The C-4-like material was subsequently examined by an explosives expert at ATF. Based on this review, the explosives expert informed me that the C-4-like material was consistent with that of being produced with commonly available materials, i.e. homemade rather than commercially manufactured.

21.   Law enforcement conducted surveillance on Malcolm prior to the planned meeting with the UCs. Surveillance observed Malcolm exit the residence at 3226 Garfield Ave, Carmichael, CA and then drive directly to the meeting location with the UCs. Immediately after the meeting with the UCs, Malcolm returned to the residence at 3226 Garfield Ave. Surveillance observed Malcolm unlock the front door of the residence using a key.

   a.   3226 Garfield Ave is address listed as Malcolm's residence with the California Department of Motor Vehicle.

   b.   On May 4, 2014, I queried Accurint. According to Accurint, Malcolm is associated with 3226 Garfield Ave.

      i.  Accurint is a comprehensive database of public records (e.g. motor vehicle records, business records, and real property records) maintained by LexisNexis. Accurint is used by law enforcement to verify names and addresses. I have used Accurint in past investigations and found it to be accurate.

### April 27, 2014 – Malcolm Begins Using TT#2

22.    On April 27, 2014, Malcolm contacted one of the UCs by telephone. Malcolm told the UC that he had dropped his current phone number TT#1 and was now using a cell phone with phone number TT#2. In the time since, Malcolm has contacted the UCs from phone number TT#2 on numerous occasions.

    a.  As of April 30, 2014, toll records indicated that TT#1 was still active. I believe that Malcolm is still using TT#1 but is attempting to compartmentalize this contacts.

    b.  The UCs last spoke to Malcolm on TT#2 on May 1, 2014.

### Upcoming Planned Meeting

23.    On May 1, 2014, the UCs spoke with Malcolm. The UCs and Malcolm agreed to meet on Wednesday, May 7, 2014. During the meeting, Malcolm planned to sell ten pounds of an improvised C-4-style explosive material, blasting caps for the C-4, four remote detonators for the C-4 material, four fully automatic short-barreled AR-15 style firearms, and two silencers to the UCs in exchange for $21,000.

24.    During the course of the meetings between the UCs and Malcolm the UCs discussed their desire to purchase firearms and explosives using a cover story. The UCs told Malcolm that they were arms suppliers to drug trafficking organizations. For example, the UCs told Malcolm that they were interested anti-personnel explosive devices for the purpose of protecting a marijuana growing operation in Northern California. Additionally, the UCs told Malcolm that they were moving arms to drug trafficking organizations in Mexico.

### Malcolm's Storage Unit

25.    On May 1, 2014, law enforcement surveillance observed Malcolm exit his residence at 3226 Garfield Ave. and drive directly to Longview Self-Storage, 4203 Industry Drive,

*a Malcolm drove a blue 2007 Chevrolet Trailblazer license 6ZCV9J0*

Sacramento, California. ^Surveillance observed Malcolm enter into storage unit "5," located within building "J."

26.    On May 2, 2014, law enforcement again observed Malcolm travel to his storage unit at Longview Self-Storage.

27.    On April 3, 2014, during the meeting with Malcolm and the UCs, Malcolm showed the UCs a picture on his phone depicting four fully constructed AR-15-style rifles. The rifles were sitting on a 2x4 frame and set against a corrugated steel backdrop. I am familiar with the storage units at Longview Self-Storage and the backdrop of the photograph was consistent with the storage units at Longview Self-Storage. During the meeting, Malcolm advised the UCs that he used a workshop to build the firearms and firearms component that he was selling to the UCs.

     a.  Based on Malcolm's association with the storage unit at Longview Self-Storage, the photograph in Malcolm's phone, and Malcolm's statements to the UCs regarding a workshop, I believe that Malcolm is using the storage unit at Longview Self-Storage to manufacture and store firearms, firearms components, explosives and explosive components.

28.    Depicted below is a photograph of Malcolm entering storage unit J5.



*28 a.* ON MAY 4, 2014, AT APPROXIMATELY 1045AM ATF AGENTS RECIEVED NOTIFICATION THAT A PREVIOUSLY INSTALLED GPS TRACKER AT HAD BEEN REMOVED FROM TARGET VEHICLE. I BELIEVE MALLCOLM WAS AWARE OF LAW ENFORCE MENT SURVEILLANCE MALLCOLM WAS TAKEN INTO CUSTODY ON MAY 4, 2014 AT APPROX IMATELY 935 PM.

### Training and Experience Related to Firearms and Explosives Trafficking

29.    I know from my training, experience, and discussions with other experienced law
       enforcement officials that firearm and explosives traffickers and/or manufacturers
       frequently possess the following evidence of their unlawful activity in their residences,
       storage units, vehicles and on their persons:

   a.  Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine
       repair kits, trigger assemblies, blanks, and barrels,

   b.  Information concerning where and from whom the trafficker/manufacturer
       purchased firearms, firearm parts, explosives, and explosive materials,

   c.  Information concerning where and to whom the trafficker/manufacturer sold
       firearms, firearm parts, explosives, and explosive materials,

   d.  Firearm and explosive records (purchase/sale, method of payment), documents
       related to milling of the firearms, manufacturing of explosives, notes or other
       documentation concerning profits made (i.e., comparing cost of purchase vs. cost
       of sale),

   e.  Information concerning methods used to advertise the availability of their
       firearms, firearm parts, explosives, and explosive material for purchase,

   f.  Photos of their firearms, firearm parts, explosives, and explosive material for
       purposes of advertising for sale, to keep track of their inventory, for insurance in
       case of theft, etc.

   g.  Written, recorded oral, or digital communications with associates involved in the
       purchase/sale of firearms, firearm parts, explosives, and explosive materials,

   h.  Bank deposit records, checking account records, and other financial
       documentation showing the purchase of firearms, firearm parts, explosives, and
       explosive material, the securing of cash to purchase firearms and explosives, and
       the depositing of cash proceeds from the sale of firearms and explosives,

   i.  Cell phone records which show the phone number and subscriber information,
       and numbers called/received,

j. Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

k. Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws,

l. Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

m. Explosive materials, precursor chemicals for the manufacture or development of explosive materials, including any containers.

n. Detonation devices, fuses, or parts used in the manufacture of detonation devices, including containers and packaging material.

o. Literature, diagrams, books, documents, emails, communications related to explosives, manufacture of explosives, detonators, manufacture of detonators, poisons, or manufacture of poisons.

p. Assembled improvised explosive devices, and unassembled components of these devices to include, but not limited to:

   i. Metal, plastic or cardboard containers (i.e. pipe nipples, end caps, pvc pipe, cardboard tubes, bowls) or other containers;

   ii. Explosive filler material to include, but not limited to: powders (i.e., black powder, smokeless powder, Pyrodex, flashpowder), match heads, commercially manufactured high explosive materials (i.e., dynamites, slurries, emulsions), or unmixed chemical powders, substances or liquid

   iii. Chemicals that can be combined to produce an explosive material;

   iv. Mixing bowls, glassware or other containers, spoons, funnels or other mixing implements.

   v. Commercially manufactured detonators or improvised detonators, either electric or non-electric or other initiating componentry to include but not limited to: filaments, flash bulbs, rocket motors, fuses (i.e. commercially

manufactured hobby fuse, safety fuse, quick match, or other improvised
fuses;

vi. Electronic componentry, to include, but not limited to: Wires/wiring, tape
(i.e., electrical, duct, masking), wire connectors, shrink tube, wire ties,
relays, switches, circuit boards, capacitors, batteries, E-cells or other
power sources, and timing/remote control mechanisms;

30. I know from my training and experience and discussions with experienced law
enforcement officers, that individuals that own firearms store the firearms in safes, gun
safes, locked cabinets, and/or other secured containers. I also know that individuals that
possess firearms typically store their firearms in their homes. They store their firearms in
their homes for a number of reasons, including, to safely and securely store the firearm,
for quick access to the firearm for personal and property protection, and for convenient
access for use of firearms for sporting purposes.

31. I know that firearm and explosives traffickers and/or manufacturers, as well as criminal
co-conspirators generally, use cellular telephones to communicate with one another,
either by voice or text message. Cellular telephones are digital devices that preserve in
their memory a history of incoming, outgoing, and missed calls, which can lead to
evidence of the telephone numbers of other firearm and explosives traffickers and/or
manufacturers and the dates and times that they and/or the mobile telephone user dialed
one another's telephones. Cellular telephones also contain in their memory a telephone
book. This allows the user to store telephone numbers and other contact information; the
information stored in a telephone used by firearm and explosives traffickers and/or
manufacturers is evidence of the associations of the firearm and explosives traffickers
and/or manufacturers, some of which are related to his or her illegal business. Cellular
telephones also contain in their memory text messages sent, received, and drafted by the
mobile telephone user. The text message history of a firearm and explosives trafficker's
and/or manufacturer's mobile telephone can contain evidence of firearm and explosive
trafficking and/or manufacturing because it shows the communications or planned
communications of a firearm and explosive trafficker and/or manufacturer and the
telephone numbers of those with whom the firearm and explosive trafficker and/or
manufacturer communicated or intended to communicate. Cellular telephones also have
a voicemail function that allows callers to leave messages when the telephone user does
not answer. Firearms and explosive traffickers and/or manufacturers sometimes leave
voice messages for each other and this is evidence both of their mutual association and
possibly their joint criminal activity. Cellular telephones can also contain other user-
entered data files such as "to-do" lists, which can provide evidence of crime when used
by firearm and explosives traffickers and/or manufacturers. Cellular telephones can also

contain photographic data files, which can be evidence of criminal activity when the user was a firearms and explosive trafficker who took pictures of evidence of crime. Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

a. It has been my experience in the past, and particularly in this case, that when suspects utilize cellular telephones to communicate with cooperating individuals or undercover agents to set up the purchase of guns and explosives, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the firearm and explosive trafficker and/or manufacturer in this case, Malcolm have used phone calls and text messaging to communicate about his ongoing trafficking and/or manufacturing of firearms and explosives.

32. In my experience, firearm and explosives traffickers and/or manufacturers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

33. Repeated firearm and explosive trafficking and/or manufacturing activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearm and explosive traffickers and/or manufacturers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

34. As a result of my experience and training, I have learned that firearm and explosives traffickers and/or manufacturers maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices. It is also my experience that these traffickers and/or manufacturers tend to keep these accounts and records in their residence and in the areas under their control. Through my training and experience, I know that the business of firearms and explosives trafficking and/or manufacturing is similar to drug trafficking and by analogy in the case of drug dealers, evidence is likely to be found where the dealers live. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

35.    Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, many people carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm and explosive trafficker's and/or manufacturer's person to secure this evidence.

36.    I know, based on my training and experience, that the number of firearm and explosive traffickers and/or manufacturers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearm traffickers and/or manufacturers and distributors convenient devices for recording information concerning firearms, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearm traffickers and/or manufacturers and distributor. Much of the electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearm and explosive traffickers and/or manufacturers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearm and explosive traffickers and/or manufacturers, these communication devices are part of their normal business equipment.

37.    Accordingly, based on the investigation in this case and my training and experience, I believe that items listed in Attachment B will be found on the persons and in the vehicles and locations listed in Attachments A-1, A-2, and A-3.

## CONCLUSION

38.    Based on the forgoing, there is probable cause to believe that the location identified in Attachments A-1, A-2, and A-3 have been and are currently being used to commit the Target Offenses and therefore contains evidence, fruits, and instrumentalities of the

Target Offenses. Additionally, there is probable cause to believe that Malcolm committed the Target Offenses.

39.   Your Affiant further requests permission to search the location identified in Attachments A-1, A-2, and A-3 at any time in the day or night and ~~without first knocking and~~ ~~announcing law enforcement presence~~ based upon probable cause to believe that Malcolm ~~and any~~ confederates present a substantial risk to law enforcement personnel and the public in the neighborhood of the premises. *United States v. Smith*, 456 F.2d 1236, 1237 (9th Cir. 1972). Because this investigation involves firearms and explosives and statements by Malcolm regarding poison, I believe that ~~surreptitious~~ entry is necessary to ensure the safety of the agents ~~conducting the search warrant.~~

of the public, and neighbors in the area
or of the premises, believed to
Contain RDX or C4, highly
explosive materials. I believe
that some Malcolm Malcolm apparent
discovered the tracking device,
he may have alerted others
that law enforcement may be
coming, and evidence may be
Compromised / destroyed unless
immediate search is
authorized.

DANIEL H. YUN
ATF Special Agent

Sworn and Subscribed to me on May 4, 2014

Hon. CAROLYN K. DELANEY
United States Magistrate Judge

Approved as to form:

JUSTIN L. LEE, AUSA

## ATTACHMENT A-1

### *Description of the Location to be Searched*

The residence located at 3226 Garfield Avenue, Carmichael, California.



The authority to search this location includes:

1. The person of:

    a. James MALCOLM

2. The search of this location shall also include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, sheds and outbuildings associated with the premises and shall extend into desks, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises in which items in Attachment B may be found.

The search of this location shall also authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises. Any and all persons within the premises shall be subject to a patdown safety search to ensure officer safety.

.The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

## ATTACHMENT A-2

### *Description of the Location to be Searched*

The storage unit located at Longview Self-Storage, 4203 Industry Drive, Unit J5, Sacramento, CA.

The search of this location, in the interest of public safety and common law enforcement practice, shall allow law enforcement officers to make any weapon on the property safe by removing the source of ammunition and ensuring that there are no rounds of ammunition in the chamber.

## **ATTACHMENT A-3**

### *Description of the Location to be Searched*

A blue 2007 Chevrolet Trailblazer, California license 6ZCV910.

## ATTACHMENT B

### *List of Items to be Seized*

The following items constitute evidence, fruits, proceeds, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) – Unlawful Dealing in Firearms; 18 U.S.C. § 922(o) – Unlawful Possession and Transfer of a Machinegun; 18 U.S.C. § 844(o) – Transfer of Explosive Materials for Use in a Crime of Violence or Drug Trafficking Crime; and 26 U.S.C. § 5861(f) – Unlawful Manufacturing of a Firearm.

1. Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and blanks of any kind (including AR-10 and AR-15 blanks).

2. Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-10 and AR-15-style firearms.

3. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

4. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

5. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Record Of Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.

6. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tend to establish communication between co-conspirators.

7. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing.

8. United States currency in excess of $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or manufacturing of illegal firearms.

9.      Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

10.     Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

11.     Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachments A-1 and A-2. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

12.     Any computer numerical control ("CNC")[1] machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-10 and AR-15 blanks (and firearm blanks of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

13.     Any explosive materials, precursor chemicals for the manufacture or development of explosive materials, including any containers.

14.     Detonation devices, fuses, or parts used in the manufacture of detonation devices, including containers and packaging material.

15.     Any poisons, precursor chemicals for the manufacture or development of poisons, including any containers.

16.     Any literature, diagrams, books, documents, emails, communications related to explosives, manufacture of explosives, detonators, manufacture of detonators, poisons, or manufacture of poisons.

17.     Assembled improvised explosive devices, and unassembled components of these devices to include, but not limited to:

        a.   Metal, plastic or cardboard containers (i.e. pipe nipples, end caps, pvc pipe, cardboard tubes, bowls) or other containers;

        b.   Explosive filler material to include, but not limited to: Powders (i.e., black powder, smokeless powder, Pyrodex, flashpowder), match heads, commercially manufactured high explosive materials (i.e., dynamites, slurries, emulsions), or unmixed chemical powders, substances or liquid

[1] A machine utilizing a type of programmable automation, directed by mathematical data, which uses microcomputers to carry out various machining operations.

c. Chemicals that can be combined to produce an explosive material;

d. Mixing bowls, glassware or other containers, spoons, funnels or other mixing implements.

e. Commercially manufactured detonators or improvised detonators, either electric or non-electric or other initiating componentry to include but not limited to: filaments, flash bulbs, rocket motors, fuses (i.e. commercially manufactured hobby fuse, safety fuse, quick match, or other improvised fuses;

f. Electronic componentry, to include, but not limited to: Wires/wiring, tape (i.e., electrical, duct, masking), wire connectors, shrink tube, wire ties, relays, switches, circuit boards, capacitors, batteries, E-cells or other power sources, and timing/remote control mechanisms;